IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                               Criminal No.:  ELH-18-623

CHRISTOPHER LOVELACE
*Defendant.*

**MEMORANDUM OPINION**

Christopher Lovelace, defendant, pled guilty in July 2019 to possession of a firearm by a convicted felon, for which he is serving a sentence of 72 months' imprisonment at Petersburg Low FCI, with credit dating from August 25, 2018.  ECF 67-1 at 3.  *See* ECF 1; ECF 36; ECF 50; ECF 71.  Through counsel, he has filed a motion for compassionate release (ECF 65), accompanied by a memorandum of law (ECF 67) (collectively, the "Motion") and five exhibits.  According to defendant, compassionate release is warranted due to his various health conditions, and in light of the COVID-19 pandemic.  The government's opposition is docketed at ECF 69 (the "Opposition"), supported by five exhibits.  Defendant has replied.  ECF 70.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

**I.  Background**

Lovelace was indicted on December 18, 2018.  ECF 1.  He was charged in Count One with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  *Id.* at 1. And, in Count Two, the Indictment charged possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a).  *Id.* at 2.

On July 8, 2019, defendant entered a plea of guilty to Count One of the Indictment (ECF 36), pursuant to a Plea Agreement.  ECF 37.  The transcript is at ECF 57.  Under FED. R. CRIM. P. 11(c)(1)(C), the parties agreed to a sentence ranging from 57 to 90 months of imprisonment.  ECF 37, ⁋ 9.

The Plea Agreement included a Stipulation of Facts.  *Id.* at 10-11.  According to this Stipulation, "[o]n the night of August 25, 2018, a Baltimore Police Officer" noticed a woman give "what appeared to be money to the Defendant."  *Id.* at 10.  Thereafter, the Officer saw the Defendant walk away from the woman, "towards a dark-colored GMC Yukon," where he "reached into the front door of the car," then "walk back towards the woman," and "hand something" to her. *Id.*  These observations led the police officer to believe that "this exchange" was "likely to be a hand to hand drug transaction . . . ."  *Id.*  Accordingly, he "called in other officers to arrest the Defendant, the woman, and to secure any relevant evidence."  *Id.*

After placing defendant under arrest, officers found on his person "U.S. currency, gelcaps containing a white powdery substance, and the keys to the GMC Yukon."  *Id.*  The officers then conducted a search of the vehicle and found on the driver's seat a "clear plastic bag that contained gelcaps with a white powdery substance inside, matching the ones found on Lovelace's person." *Id.*  Lab tests later determined the gelcaps "contained fentanyl, with a combined weight totaling just under 8 grams."  *Id.*

In the GMC Yukon, officers also found, "just under those gelcaps covered by a towel," a ".40 caliber pistol . . . which was loaded with seven cartridges of .40 caliber ammunition," as well as "a prescription pill bottle with the Defendant's name on the label and several gift or credit cards which also bore the Defendant's name."  *Id.*  Defendant admitted that "he possessed the recovered pistol."  *Id.*

The Stipulation also notes that "[a]t all times relevant to the count of conviction, the Defendant had been convicted of a crime punishable by more than one year imprisonment, the Defendant knew of this prior conviction," and defendant "possessed the firearm knowing that he was prohibited from possessing any firearm." ECF 37 at 10.

In the Plea Agreement, the parties disputed the applicable base offense level under the Sentencing Guidelines ("U.S.S.G." or "Guidelines"). According to the government, the "base offense level" should be "24 pursuant to U.S.S.G. § 2K2.1(a)." *Id.* ¶¶ 6(a)(i). However, defendant claimed that the relevant offense level is "20 pursuant to U.S.S.G. § 2K2.1(a)(4)." *Id.* ¶ 6(a)(ii). But, both parties agreed that defendant "is subject to a 4-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)." *Id.* ¶ 6(b). This enhancement applied because the firearm was possessed in connection with another felony offense, *i.e.*, distribution of fentanyl.

Further, the government specified that it did not "oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct." *Id.* ¶ 6(c). And, under U.S.S.G. § 3E1.1(b), the government agreed "to make a motion . . . for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty." *Id.*

There was no agreement as to defendant's criminal history. *Id.* ¶ 7. But, the Plea Agreement reflects defendant's understanding that his offense level could be altered if he were "determined to be career offender or if the instant offense was a part of a criminal conduct from which the Defendant derived a substantial portion of the Defendant's income." *Id.*

The Presentence Investigation Report (ECF 40, the "PSR") reflects that the defendant was born on February 15, 1979. *Id.* at 2. According to the PSR, defendant dropped out of high school

in his junior year, but "obtained his GED in or around 2005." ECF 40, ¶¶ 56, 57; *see* ECF 67-5 at 1. Further, the PSR includes several prior convictions, consistent with a criminal history category of IV. ECF 40, ¶ 36.

In particular, Lovelace has five prior adult criminal convictions. *See id.* ¶¶ 28-36. Two of these offenses did not score points. *See id.* ¶¶ 29, 31. Of pertinence here, defendant's record includes a second degree murder conviction in 1998, as well as more recent convictions for unlawful possession of a firearm and conspiracy to distribute heroin. *Id.* ¶¶ 30, 32, 33.

As to the murder conviction, Lovelace was arrested in Baltimore in 1997 on charges of second-degree murder and use of a handgun in the commission of a crime. *Id.* ¶ 30. He was 18 years old at the time. *Id.* The Circuit Court for Baltimore City sentenced him to thirty years' imprisonment for the murder, of which twenty years were suspended, and to a concurrent sentence of twenty years imprisonment for the gun charge, of which fifteen years were suspended. *Id.* Defendant was released from prison on May 2, 2007. *Id.*

In February 2015, defendant was sentenced to five years' incarceration, three of which were suspended, for illegal gun possession. *Id.* ¶ 32. And, on April 25, 2018, four months prior to the date of the instant offense, defendant pled guilty to conspiracy to distribute heroin, for which he was sentenced to thirteen years' incarceration, with all but two days suspended. *Id.* ¶ 33.

The PSR also noted that defendant has "never seen a psychiatrist or psychologist." *Id.* ¶ 52. But, defendant indicated that he suffered from a gambling addiction. *Id.* In Lovelace's telling, "he gambled anything he had had and even sold his wife's rings and lost their home due to debt." *Id.* Further, he claimed that he "owes his employer money, in addition to family and friends." *Id.* And, he asserted that he has experienced "safety issues when he did not pay his debts." *Id.* Indeed,

in the Motion, Lovelace contends that his gambling addiction was "[t]he root of [his] drug activity." ECF 67 at 7.

Moreover, defendant reported a history of habitual alcohol use that began when he was a teenager, as well as the occasional use of marijuana. ECF 40, ¶¶ 53-54. He also submitted that he has never "had the benefit of substance abuse treatment." *Id.* ¶ 55.

Sentencing was held on October 18, 2019. ECF 49; *see* ECF 59 (Transcript). Lovelace was forty years old at the time. *See* ECF 40 at 2; *id.* ¶ 6. Defense counsel submitted a comprehensive sentencing memorandum with exhibits. ECF 43.

At sentencing, the government agreed to the defendant's position regarding the calculations of the Guidelines. In particular, the defendant's prior drug conspiracy conviction was not a "controlled substance offense" under § 2K2.1. *See* ECF 59 at 3-4, 6. Therefore, the defendant's base offense level was 20, not 24. Accordingly, the Court determined that Lovelace had a final offense level of 21 and a criminal history category of IV. ECF 51; ECF 59 at 7.

The Guidelines called for a period of imprisonment ranging from 57 to 71 months. ECF 51. But, as noted, the parties agreed that "a sentence between 57 months and 90 months of imprisonment" would be an "appropriate disposition of this case . . . ." ECF 37, ¶ 9. And, the Court imposed a sentence of 72 months' imprisonment, ECF 50 at 2, followed by three years of

supervised release.  ECF 50 at 3.[1]  I also ordered forfeiture of defendant's .40 caliber pistol, seven cartridges of .40 caliber ammo, and $533.  *Id.* at 6.[2]

As referenced above, Lovelace is currently serving his sentence at Petersburg Low FCI. ECF 71.[3]  He has a projected release date of October 5, 2023.  *See* ECF 67; ECF 67-1 at 3; ECF 69-4 at 2, 4.  To date, he has served approximately 52% of his sentence.  Defendant submits that he "has had a spotless record during incarceration" and has "zero disciplinary infractions."  ECF 67 at 7; *see* ECF 67-1 at 1.

In the Motion, defendant indicates that he submitted a request for compassionate release to the Warden on August 11, 2020.  ECF 67 at 2.  That request was promptly denied.  *Id.*; *see* ECF 67-2 (concluding that defendant's medical conditions did not warrant a reduction in his sentence and that defendant was not yet eligible for "placement on Home Confinement").  Thereafter, Lovelace "asked counsel to petition the Court on his behalf."  ECF 67 at 2.

Lovelace also claims to have a "stable reentry plan."  ECF 67 at 7; *see* ECF 67-5. Specifically, he submits that, if released, he "would reside with his sister, Ms. Michele Lovelace, in Parkland Maryland."  ECF 67 at 7.  Further, defendant provides that he would consent to "a period of home confinement as a condition of supervised release."  *Id.* at 8; *see* ECF 70 at 3.

---

[1] The PSR (ECF 40 at 2) reflects that defendant was detained beginning on July 30, 2018. The Judgment also reflects credit from that date.  ECF 50 at 2.  However, the incident did not occur until August 25, 2018.  And, BOP has given defendant credit dating from August 25, 2018.  ECF 67-1 at 3.

[2] Lovelace noted an appeal to the Fourth Circuit.  ECF 52.  In his Plea Agreement, however, defendant waived the right to appeal, unless the sentence exceeded 90 months.  ECF 37, ¶ 11.  He subsequently dismissed the appeal.  ECF 61.

[3] BOP records indicate that defendant began serving his sentence in Cumberland FCI.  *See* ECF 67-3 at 3; ECF 67-5 at 1.  But, defense counsel has represented that Lovelace was transferred to Petersburg Low FCI sometime in early 2021.  ECF 71; *see also Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited October 7, 2021).

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  Originally, a court was permitted to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018);

*see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)    **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I)  suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the
aging process,

that substantially diminishes the ability of the defendant to provide self-care
within the environment of a correctional facility and from which he or she
is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where
the defendant is at least 65 years of age, has serious physical or mental health issues, and has served
at least 10 years in prison or 75% of the sentence.   Application Note 1(C) concerns Family
Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce
a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the
defendant's case an extraordinary and compelling reason other than, or in combination with, the
reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is
the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate
Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.
However, the Court may not rely on the Program Statement.  Rather, the Court must consider the
Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30
(4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t)
(directing Sentencing Commission to "describe what should be extraordinary and compelling
reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under §
3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy
statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229,
230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t)

(directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States*

*v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

To be sure, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

### III.  COVID-19[4]

The nation has been "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[5]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F.Supp.3d 242, 247 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F.Supp.3d 746, 752-753 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis.

The virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of October 7, 2021, COVID-19 has infected more than 43 million Americans and caused over 708,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Oct. 7, 2021).

The virus continues to afflict those residing in the United States and in countries around the world. Although this country saw a reduction of cases for a period of time, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months"). Furthermore, the Delta variant is thought to be more virulent and capable of causing more severe illness than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 26, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"). But, in recent weeks, the reports of illness and deaths have begun to decline. *See* Rachel Roubein, *The Delta Wave is Subsiding but Deaths are Still High*, WASH. POST, Oct. 12, 2021, https://www.washingtonpost.com/politics/2021/10/12/delta-wave-is-subsiding-deaths-are-still-high/.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, July 17, 2020, November 2, 2020, and March 29, 2021, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. On August 20, 2021, to reflect the most recently available data, the CDC again revised its guidance. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 29, 2021), https://bit.ly/38S4NfY (updated Aug. 20, 2021). According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension;

dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; and substance use disorders. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

And, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION, May 14, 2020, https://bit.ly/2WBcB16.

To stem the spread of the virus, the CDC urged people to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social

distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks posed to inmates and employees of the BOP from COVID-19.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *see Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall.  During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners were known to have been infected in federal facilities.  Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021).  And, according to the article, the actual count was most likely much higher "because of the dearth of testing."  *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, then the Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 466 F.Supp.3d 587, 599 at *8 (E.D. N.C. 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 466 F.Supp.3d at 599.  The memorandum of April 3, 2020, "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*[7]

And, as reflected in an exhibit attached to the government's Opposition, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, "further implementing the Attorney General's directives on the increased use of home confinement."  ECF 69 at 7; *see* ECF 69-3.  Specifically, the memorandum described the factors used by the BOP to "ensure inmates are suitable for home confinement," and further provided that the BOP is prioritizing the review of inmates for home confinement who have either "served a certain portion of their sentence, or who only have a relatively short amount of time remaining in their sentence."  ECF 69-3 at 2-3.  However, it also stressed that "these priority factors are subject to deviation in certain circumstances and are subject to revision . . . ."  *Id.* at 3.

---

[7] The government attached then Attorney General Barr's memoranda of March 26 and May 8 as exhibits to its Opposition.  *See* ECF 69-1; ECF 69-2.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility subsequently expanded, and vaccines are now available to all persons twelve years of age and older.  Approximately 66% of the eligible population, and 68% of all persons eighteen years of age and older, are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times,  https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html  (last visited Oct. 7, 2021).  And, about 56% of the total U.S. population is fully vaccinated.  *See id.*[8]

Critically, the CDC has said that "the vaccines authorized in the United States are highly effective at preventing severe disease and death, including against the Delta variant."  *Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html, *supra.*  Indeed, according to CDC officials, COVID-19 is rapidly becoming a "pandemic of the unvaccinated." Emily Anthes & Alexandra E. Petri, *CDC Director Warns of a 'Pandemic of the Unvaccinated,'* N.Y. TIMES, (Jul. 22, 2021),  https://www.nytimes.com/2021/07/16/health/covid-delta-cdc-walensky.html.

Nevertheless, even vaccinated individuals are not entirely immune from risk.  *See* Mandavilli*, supra.* (reporting that so-called "breakthrough infections" of COVID-19 in vaccinated Americans, though uncommon, are rising "with the arrival of the Delta variant").  One recent study

---

[8] Recently, given the virulence of the Delta variant, the percentage of those who are vaccinated has increased.  *See* Joe Neel, *Vaccination Rates Rose in August as COVID Cases Surged Due to the Delta Variant*, NPR, Aug. 31, 2021, https://www.npr.org/2021/08/31/1032994955/vaccination-rates-rose-in-august-as-covid-cases-surge-due-to-the-delta-variant.

found that breakthrough infections can put the vaccinated at risk of so-called "long-COVID" symptoms for at least six weeks, such as "headaches, muscle pain, loss of taste and smell and fatigue." Rob Stein, *COVID Symptoms May Linger in Some Vaccinated People Who Get Infected, Study Finds*, NPR, (Jul. 28, 2021), https://www.npr.org/sections/health-shots/2021/07/28/1021888033/breakthrough-infections-may-cause-long-covid-symptoms-small-study-suggests.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Under its plan, prisoners at heightened risk received priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Clare Hymes, *Federal Prisons to Prioritize Staffers for COVID-19 Vaccine and Give to Inmates When More Doses are Available*, CBS NEWS, (Dec. 16, 2020), https://www.cbsnews.com/news/covid-vaccine-federal-prisons-staffers/.

As of October 7, 2021, the BOP housed 132,007 federal inmates and employed approximately 36,000 staff. And, by that date, the BOP had administered 229,171 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Oct. 7, 2021).

Moreover, as of October 7, 2021, the BOP reported that 364 inmates out of a total of 132,007 inmates, and 462 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 43,108 inmates and 7,860 staff have recovered from the virus; and 262 inmates and six staff members have died from the virus. And, the BOP has completed 122,749 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Petersburg Low FCI, where the defendant is imprisoned, the BOP reported that as of October 7, 2021, out of a total of 693 inmates, none have tested positive. But, one staff member has tested positive for COVID-19, and 246 inmates and 39 staff have recovered at the facility. In addition, of the combined 2,141 inmates housed in either Petersburg Low FCI or Petersburg Medium FCI, 2,085 inmates, as well as 382 staff members, have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Petersburg Low*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/pet/, (last visited Oct. 7, 2021). But, the Court has not been provided with information as to the defendant's vaccination status.

### IV. Discussion

In the Motion, Lovelace argues that the Court should "reduc[e] his sentence to time served," out of concern for his "vulnerability to COVID-19." ECF 67 at 1. Specifically, defendant claims that such a reduction is necessary because he "suffers from morbid obesity, sleep apnea, prediabetes, and hypertension, which place him at serious risk of becoming severely ill from COVID-19." *Id.* Moreover, he claims that a balancing of "the relevant sentencing factors of 18 U.S.C. § 3553(a)," with his "compromised physical health and the unique danger he faces of contracting COVID-19," establish that relief is warranted. *Id.* at 6.

In its Opposition, the government notes that Lovelace's "various medical ailments . . . cannot constitute the rare and extraordinary circumstances warranting [defendant's] release from prison." ECF 69 at 1. But, even if defendant's "medical conditions are sufficiently serious," the government contends that "the Defendant must remain incarcerated because . . . the Defendant remains a danger to the community." *Id.*

### A.

Lovelace, who is now 42 years of age, claims to present "several of the risk factors identified by the CDC and studies on those infected: obesity and hypertension." ECF 67 at 3; *see* ECF 67-3 at 1. The Motion states: "Although BOP medical records designate Mr. Lovelace as obese, his counsel could not locate a current weight to calculate his BMI." ECF 67 at 3 n.1; *see* ECF 67-3 at 1. However, defendant points outs that the PSR reflected that, in 2019, he stood 5'6" tall and weighed approximately 330 pounds, "which would compute to a BMI of 53.3." ECF 67 at 3 n.1; *see* ECF 40, ⁋ 50. According to the CDC, a BMI of this magnitude qualifies defendant as severely obese. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/38S4NfY (updated Aug. 20, 2021). Moreover, defendant notes that he suffers from prediabetes and sleep apnea. ECF 67 at 3-4; *see* ECF 67-3 at 1-2.[9]

The government "does not dispute that people who have certain underlying medical conditions are at higher risk for severe illness from COVID-19" or that defendant "appears to suffer from medical conditions, including obesity, hypertension, and others." ECF 69 at 8. Moreover, the government concedes that the "CDC does recognize obesity as a condition that increases a patient's risk for severe illness if the patient becomes infected with COVID-19." *Id.*

However, the government argues that obesity "is hardly rare," and therefore "cannot be extraordinary or compelling reason to justify release." *Id.* at 9. As to defendant's remaining medical conditions, the government contends "none . . . can help him meet his burden for the simple reason that none are known to increase the risk of severe illness from COVID-19." *Id.* Specifically, the Opposition notes that the CDC suggests only that hypertension "might" put

---

[9] Defendant appended an exhibit to the Motion that includes three studies that, broadly speaking, demonstrate an association between sleep apnea and a heightened risk of severe disease from COVID-19. *See* ECF 67-4.

defendant at increased risk of severe disease from COVID-19.  ECF 69 at 9. (emphasis omitted).

Moreover, it claims that defendant's sleep apnea and prediabetes "are not even in this speculative

category." *Id.*

The government's contentions are not well taken.  As defendant describes, "[i]n the context

of compassionate release considerations, it matters not that a large percentage of Americans are

obese . . . ." ECF 70 at 2.  Rather, it is sufficient that, because of defendant's obesity, defendant

faces a heightened risk of severe disease if he were to contract COVID-19.  *See People of Any Age*

*with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION, Nov. 2,

2020, https://bit.ly/38S4NfY; *see also* Emily Anthes, *Severe* Obesity *Raises Risk of Covid-19*

*Hospitalization and Death, Study Finds*, N.Y. TIMES (Mar. 8, 2021) ("A large new study has

confirmed an association between obesity and patient outcomes among people who contract the

coronavirus.").  Moreover, as earlier noted, the CDC has cautioned that a person with multiple

health conditions, like defendant, is at even greater risk of severe illness from COVID-19.

Accordingly, defendant's obesity, coupled with his other medical problems, constitutes a

qualifying medical condition.

However, I cannot conclusively determine whether defendant may claim that his

vulnerability to COVID-19 presents an extraordinary and compelling circumstance, because the

Court has no information as to defendant's vaccination status.  As Judge Gallagher observed:

"[T]he highly effective available vaccines dramatically alter whether an inmate's medical

conditions constitute the 'extraordinary and compelling reason' required to further consider

compassionate release." *United States v. Harris*, SAG-05-61, 2021 WL 1516012, at *2 (D. Md.

Apr. 16, 2021).  *See also, e.g.*, *United States v. Smith*, 3:15-cr-101, 2021 WL 3641463 at *2-*3

(E.D. Va. Aug. 17, 2021); *United States v. Meza-Orozco*, 14-CR-5426 (BHS), 2021 WL 3630519,

at *4 (W.D. Wash. Aug. 17, 2021); *United States v. Alvarez*, 18-CR-656 (LTS), 2021 WL 3550218, at *3 (S.D.N.Y. Aug. 10, 2021). *But see United States v. Spriggs*, CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (noting that "the fact that [the defendant] received a vaccine does not negate that his underlying health conditions make him eligible for compassionate release," and explaining that a contrary conclusion "would ignore the remaining unknowns about the protection the vaccine can provide"); *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *4-*5 (E.D. Mich. Aug. 6, 2021) (finding that a defendant who had received one dose of a COVID-19 vaccine and would soon be fully vaccinated had nonetheless shown an extraordinary and compelling reason warranting a reduced sentence because of the threat posed to him by the Delta variant).

Courts have also found that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim of susceptibility to the effects of COVID-19 as a ground for compassionate release. *See e.g.*, *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see also United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–*4 (D.D.C. May 24, 2021) (noting that the defendant had "the advantage of being represented—and informed of the benefits of vaccination—by counsel," and that by exercising his right to refuse vaccination, the defendant "endanger[ed] himself and those around him"); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021) (denying defendant's motion for compassionate release on the grounds that the defendant refused the vaccine even though he did not have any "medical contraindications for vaccination").

Understandably, the parties' briefing does not address these issues because, at the time of the submissions, the COVID-19 vaccines were not widely available. *See* Christopher Rowland, *Why Your Grandparents Can't Find Vaccines: Scarcity of Niche BioTech Ingredients*, WASH.

POST., Feb. 18, 2021, https://www.washingtonpost.com/business/2021/02/18/vaccine-fat-lipids-supply/. Therefore, to avoid further delay, I shall assume that defendant is either vaccinated or not opposed to vaccination.  And, his medical conditions readily satisfy the "extraordinary and compelling" prong of the § 3582 analysis.

**B.**

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).   To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id.*

25

Defendant contends that, although his offense of conviction was serious, mitigating factors warrant consideration.   ECF 67 at 6.   Lovelace highlights that the firearm that the officers recovered was found in a vehicle, rather than "on [defendant's] person," and he was found in possession of "less than 8 grams" of fentanyl.  *Id.*

As to his criminal history, defendant notes that his most serious offense, a murder charge, was committed over twenty years ago, when defendant was 18 years old.  *Id.*  Lovelace contends that he "has atoned for that tragic crime" and has "received forgiveness from the decedent's family."  *Id.*  Further, defendant avers that his more recent criminal activity is much less serious, noting that although he committed a gun offense in 2014, his history establishes "low-level drug activity."  *Id.* (citation omitted).

And, defendant asserts that his "continued incarceration is not necessary to protect the community," because his conduct was driven by "a gambling addition that can be addressed through treatment in the community."  *Id.* at 7.  Furthermore, defendant submits that he "has had a spotless record during his incarceration," and he now has a "stable reentry plan."  *Id.*  He notes, in conclusion, that the "[p]rogramming and treatment that would most effectively assist with rehabilitation . . . unfortunately is not available to him for the foreseeable future in BOP."  *Id.*  Accordingly, defendant "seeks an order reducing his sentence to time served and modifying his judgment to add a period of home confinement as a condition of supervised release."  *Id.* at 8.

The government counters that "the Defendant remains a danger to the community."   ECF 69 at 1.  In particular, the government argues that defendant's "conduct was incredibly serious: he was trafficking a deadly drug with a loaded gun nearby for protection."  *Id.* at 10.   In the government's view, "[a] gun is not any less deadly merely because it is stashed at a convenient nearby location."  *Id.*  And, according to the government, the location of the loaded gun, "just

26

under gel caps of fentanyl and a towel stashed in an SUV near the defendant," tends to show, if anything, that the gun was ready to be used, if needed.  ECF 69 at 10.  Moreover, the government points out that the eight grams of fentanyl found in defendant's possession "does nothing to undercut the seriousness of his crime" because "[m]erely two milligrams of fentanyl can kill a person."  *Id.* at 10-11.

Further, the government notes that defendant's criminal history is "lifelong and his crimes are very dangerous."  *Id.* at 11.  To that end, the government points out that the offense of conviction came just four months after the defendant was convicted of conspiracy to distribute heroin, for which he received a suspended sentence of almost thirteen years.  *Id.*; *see* ECF 40, ₱ 33.  Yet, Lovelace "reoffended by committing essentially the same conduct in the same location. . . ."  Consequently, the government avers that that defendant's "conduct is too serious to warrant early release."  ECF 69 at 13.

As I see it, the factors under § 3553(a) do not weigh in favor of releasing Lovelace.  To begin, defendant's crime is a serious one.  As the government observes, "[b]y selling a deadly drug with a loaded gun as protection, the Defendant's conduct was at the very least . . . incredibly reckless . . . ."  ECF 69 at 13.

Lovelace's criminal history is of concern to the Court.  To be sure, more than twenty years have transpired since defendant's murder conviction, and he was just 18 years old at the time of the offense.  But, he served almost ten years in prison.  ECF 40, ₱ 30.  Yet, that did not deter him from committing new crimes after his release.  And, defendant pled guilty to a drug conspiracy charge only four months prior to the date of his arrest in the case *sub judice*.  *See* ECF 40, ₱ 33.  When he engaged in the conduct at issue here, he was not deterred by the fact that he faced almost

13 years of back up time in that conspiracy case.  ECF 40, ¶ 33.[10]  To put it simply, neither Lovelace's prior experiences with imprisonment nor the threat of a lengthy sentence was sufficient to incentivize him to comply with the law.

Lovelace claims that he is not a danger to the community because his behavior was caused, at least in part, by a gambling addiction.  ECF 67 at 7. It is unfortunate that defendant grapples with such a challenging issue.  And, it may well be the case that defendant would benefit from treatment in the community.  *See id.*  But, Lovelace's troubles with gambling appear to be long-standing.  *See* ECF 43 at 6-10.  And, by defendant's own admission, he had not sought treatment for this condition. *See id.* at 9-10, 13.

In sum, defendant's commitment to his rehabilitation is laudable.  *See* ECF 67 at 7. Moreover, his post-conviction conduct and reentry plan appear promising.  *See* ECF 67-1; ECF 67-5.  But, defendant has only served a little more than three years of a six-year sentence.  In my view, this is insufficient to protect the community, even taking into consideration defendant's consent to "a period of home confinement as a condition of supervised release."  ECF 67 at 8. Therefore, I decline to grant the Motion.

## V.  Conclusion

For the reasons set forth above, I shall deny the Motion (ECF 65), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: October 14, 2021                              _____/s/_____

                                                    Ellen L. Hollander
                                                    United States District Judge

_____

[10] According to the government, the defendant received a three-year concurrent sentence for violation of his probation in that State case.  ECF 69 at 12, n.5; ECF 69-5 at 3.

28